IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

BECKY L. SEHLSTROM,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

      Defendant.

**No. 07-CV-3061-DEO**

**ORDER**

―――――――――――――――

## I.  INTRODUCTION

This case involves an application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §401 et seq.  Plaintiff, Becky L. Sehlstrom, (hereinafter "Sehlstrom"), filed this action requesting reversal of the Commissioner's decision that she is not disabled.

Sehlstrom filed her application for disability insurance on July 25, 2005.  Tr. 60.  Her application was denied initially (Tr. 23) and upon reconsideration (Tr. 29).  A hearing was held before an Administrative Law Judge ("ALJ") on June 20, 2006.  Tr. 466.  On July 24, 2006, the ALJ issued an opinion finding that Sehlstrom was not "disabled" within the meaning of the Social Security Act.  Tr. 14-20.  Sehlstrom

requested review of the ALJ's decision, however that request was denied.  Tr. 11; 5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner.  Tr. 5.

Sehlstrom is alleging a disability onset date of May 1, 2004.  Tr. 60.  At the time of filing her application, Sehlstrom was 42 years of age and had been married to her husband, Robin Sehlstrom, since 1998.  Tr. 60.  Sehlstrom alleges a tumor on her carotid artery, brain lesions, multiple sclerosis and heart problems.  Tr. 85.  Her past relevant work includes various positions in the restaurant and service industry, which will be discussed more fully below. Tr. 86-87.

## II.  MEDICAL HISTORY

Sehlstrom was diagnosed with multiple sclerosis ("MS") by Dr. Mark Costopoulos at the Mayo Clinic in Rochester, Minnesota, in August of 2005.  Tr. 349.  MS is "a demyelinating[1] disease marked by patches of hardened tissue in

_____

[1]Causing or characterized by the loss or destruction of myelin, which is a soft white somewhat fatty material that forms a thick myelin sheath about the protoplasmic (of, relating to, consisting of or resembling protoplasm, which is the organized colloidal complex of organic and inorganic substances (as proteins and water) that constitutes the living nucleus, cytoplasm, plastids, and mitochondria of the cell and is regarded as the only form of matter in which the vital
(continued...)

the brain or the spinal cord and associated especially with partial or complete paralysis and jerking muscle tremor."[2] At another visit to the Mayo Clinic in January of 2006, Dr. Farris Timimi also diagnosed her with carotid body tumor,[3] status post resection, asymptomatic LEDYARD COOP dysfunction, hypertension and diet controlled dyslipidemia.[4] Tr. 340. Dr.

---

[1] (...continued)
phenomena (as metabolism and reproduction) are manifested) core of a myelinated (having a myelin sheath, which is a soft white somewhat fatty material that forms a thick myelin sheath about the protoplasmic core of a myelinated nerve fiber) nerve fiber.

(All references to medical terminology were obtained by one of the following sources: National Library of Medicine/National Institutes of Health online medical dictionary: http://www.nlm.nih.gov/medlineplus/mplusdictionary.html, Dorland's Illustrated Medical Dictionary, 30th ed., 2003 and/or WebMD Drugs and Treatments database: http://www.webmd.com/drugs/index-drugs.aspx.)

[2] National Library of Medicine/National Institutes of Health online medical dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[3] A tumor in either of the two main arteries that supply blood to the head.

[4] A condition marked by abnormal concentrations of lipids or lipoproteins in the blood. Lipids are any of various substances that are soluble in nonpolar organic solvents (as chloroform and ether), that with proteins and carbohydrates constitute the principal structural components of living cells, and that include fats, waxes, phospholipids,
(continued...)

Brian Weinshenker, a neurologist at Mayo Clinic, saw Sehlstrom in April of 2006.  Tr. 400.  At that time, he noted that Sehlstrom described many symptoms, "principally fatigue."  Tr. 401.  That same report states that Dr. Weinshenker was "not convinced that MS is causing any major problems at [that] time."  Tr. 401.

Sehlstrom argued that her mental residual functional capacity assessment submitted by Herbert L. Notch, Ph. D., reveals that she is moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods.  Tr. 315.  She is also moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  Tr. 316.  She also has a "mild" degree of limitation in maintaining social functioning.  Tr. 329.

Sehlstrom underwent a surgical procedure at the Mayo Clinic to remove a left carotid body tumor on August 11, 2005.

_____

[4](...continued)
cerebrosides, and related and derived compounds.

Tr. 351.  During that same visit, an MRI of her brain revealed

"several new lesions...indicating acute disease."  Tr. 351.

Sehlstrom's primary care clinic appears to be Mercy

Family Clinic in Mason City, Iowa.  In a letter written on

March 17, 2006, on behalf of Sehlstrom's request for

disability benefits, a nurse practitioner from that clinic,

Sue Mullenbach, states:

> Becky is a 42-year-old female who is
> currently under treatment at Mayo Clinic
> for dilated cardiomyopathy,[5] chronic
> obstructive pulmonary disease and multiple
> sclerosis.  It is in my opinion that she is
> not able to perform a full time position.
> She frequently has exacerbations of her
> multiple sclerosis with body aches and
> pains, various paresthesias[6] of her body,
> and excessive fatigue.

Tr. 398.

Nurse practitioner Mullenbach wrote another letter on behalf

---

[5]Any structural or functional disease of heart muscle
that is marked especially by hypertrophy of cardiac muscle, by
enlargement of the heart, by rigidity and loss of flexibility
of the heart walls, or by narrowing of the ventricles but is
not due to a congenital developmental defect, to coronary
atherosclerosis (hardening of the arteries), to valve
dysfunction, or to hypertension.

[6]A sensation of pricking, tingling, or creeping on the
skin having no objective cause and usually associated with
injury or irritation of a sensory nerve or nerve root.

of Sehlstrom on August 31, 2006.  Tr. 431.  This letter, unlike the March 17, 2006, is corroborated by Teresa Mock, M.D.  Tr. 431.  That letter states, in part:

> In my previous letter the reason I felt [Sehlstrom] was unable to work a full time status is due to the very nature of multiple sclerosis, which strikes on an intermittent basis with fatigue, weakness, and various paresthesias.  Patient may have days, at least five to six times monthly, when she would be completely unable to work and on days she is working she may need unscheduled breaks several times daily to deal with the weakness and fatigue.

Tr. 431.

This second opinion letter was submitted to the Appeals Council after the ALJ decision was issued.

## III.        ADMINISTRATIVE LAW HEARING

A hearing before an ALJ was held on June 20, 2006.  Tr. 466.  Sehlstrom appeared with her attorney, Jackie Armstrong, and was accompanied by her husband and witness, Robin Sehlstrom.  Tr. 466.  Also present was vocational expert ("VE"), Elizabeth Albrecht.  Tr. 466.

Sehlstrom testified that her primary past work experience was in "a lot of fast food places".  Tr. 470.  Her jobs did not require a lot of lifting, however some required extensive

standing such as one at Long John Silvers restaurant.  Tr.
470-471.  At the time of the hearing, Sehlstrom worked at a
Kentucky Fried Chicken restaurant as a cashier.  Tr. 471.
Cashiers are required to work standing up; but Sehlstrom is
allowed to take restroom breaks, eating breaks or just breaks
to rest whenever needed.  Tr. 471-72.  Sehlstrom worked about
four to five hours per day, and claimed that she could not
work a full day due to fatigue she experiences.  Tr. 472.

Sehlstrom experienced problems with concentration at
work; and she had difficulty remembering orders, sizing up the
to-go boxes and other daily routines.  Tr. 472-473.  These
problems began after she had her carotid artery tumor removed
in August of 2005.  Tr. 473.  She experienced memory problems
at work, forgetting to give back change or part of a food
order.  Tr. 478.  She has also forgotten to do tasks at home
such as paying the bills.  Tr. 479.

Sehlstrom testified to bladder control problems for which
she takes medication.  Tr. 475.  At the time of the hearing
her current employer, Kentucky Fried Chicken, allowed her to
take bathroom breaks as needed.  Tr. 475. Sehlstrom has

difficulty breathing and uses an Advair[7] inhaler.

Sehlstrom also testified to problems with delayed speech. Tr. 475. She described this as, "My brain knows what I want to say, but my mouth's not saying the words I want to say." Tr. 475. She has difficulty swallowing food and has the sensation that food gets stuck in her throat. Tr. 476. Her doctors have apparently told her that it is from numbness in her neck. Tr. 476.

Sehlstrom alleged pain in her shoulder, back and knee. Tr. 477. She has diabetes, but it does not interfere with her activities. Tr. 478. She also has been diagnosed with depression for which she takes medication. Tr. 478.

At the hearing with the ALJ, Sehlstrom's attorney questioned her about her MS and whether there is treatment for it. Tr. 479. Sehlstrom stated that there is treatment, but she cannot afford it. Tr. 479. She was also put on a walking regime by the Mayo Clinic, but she claims it is difficult due to her fatigue. Tr. 479.

After work, Sehlstrom's normal routine is to rest. Tr.

---

[7]Medication used as a long-term (maintenance) treatment to prevent or decrease wheezing and trouble breathing caused by asthma or ongoing lung disease (e.g., COPD, emphysema).

480. She explained that her husband is an over the road truck driver and that she has a step-daughter who is 15 and a daughter who is 10. Tr. 480. Her children help her out around the house and do not require much guidance. Tr. 481.

The ALJ questioned Sehlstrom about her ability to lift, and Sehlstrom stated that she can lift 10-15 pounds rarely. Tr. 481-482. Sehlstrom stated that she is not sure how long she could sit at a time and that she could stand for about three hours before she needed a break. Tr. 482. She also explained that she needs about three restroom breaks on a five-hour shift. Tr. 482.

Sehlstrom has medical insurance through her husband, but it would require her to pay ten percent of her medical expenses which would amount to around $1,200.00 per year for her MS treatment. Tr. 484. Again, as stated above, Sehlstrom testified that she cannot afford this treatment. Tr. 479 and p. 8, above.

On an average workday, Sehlstrom wakes up around 8:30 a.m., eats and takes her medication, to be at work by 9:00 a.m. Tr. 486. Once at work, she does food prep work until the store opens; then she cashiers, taking breaks as needed.

Tr. 486.  Once she returns home, she relaxes and tries to do the dishes or housework.  Tr. 486.  She does the clothes washing, but they do not have a dryer so either her 23 year-old son or friends help her carry the clothes to the laundromat.  Tr. 487.  Sehlstrom does not cook much, but her husband does when he is in town.  Tr. 489.  She has friends who visit, but she does not go out much because she becomes fatigued.  Tr. 487.

Sehlstrom's husband testified that his wife's condition has worsened over the years.  Tr. 490-91.  He stated that she forgets things, such as transferring money between their bank accounts.  Tr. 491.  Sehlstrom has outstanding medical bills roughly in the amount of $5,000.00 - $6,000.00.  Tr. 491.

After Sehlstrom and her husband testified, the ALJ posed two hypothetical questions to the VE.  Tr. 494-95.  Under the first, the VE was asked to consider the following:

> This will be for currently a 43-year-old woman, eighth grade education, past work as noted in 22E.  She's been diagnosed with multiple sclerosis.  She has left corroded (sic.) body tumor status post resection.  She's got chronic obstructive pulmonary disease and some depression...[and] she complains of low back pain...she can lift 20 pounds occasionally, ten pounds frequently.  She can only occasionally

balance, stoop, crouch, kneel, crawl, or climb. She cannot tolerate extremes of heat, cold, humidity, dust, or fumes. And I'm going to limit her to only occasional contact with the public, no more than a regular pace. And when I say occasional, I mean superficial. She can be around people; she just can't be doing in depth interviewing, that sort of thing. She can handle cashier jobs, that sort of thing.

Tr. 494.

Under this hypothetical, the VE found that Sehlstrom could do her past relevant work as a fast food worker and general cashier. Tr. 494.

In the second hypothetical, the VE was asked to consider the same conditions set forth in the first hypothetical, but to add "two or more unscheduled breaks per day of 15 minutes or more and a slow pace for up to one-third of the day on many days." Tr. 495. Under this hypothetical, the VE testified that Sehlstrom would not be able to do any of her past relevant jobs. Tr. 495.

**IV. THE ALJ'S DECISION**

Under the five-step sequential evaluation process, the ALJ found that Sehlstrom had not engaged in substantial gainful activity since the alleged onset date of May 1, 2004. Tr. 16. Although Sehlstrom was working part-time during this

period, she was not earning enough to be considered substantial gainful activity.  Tr. 16.

Next, the ALJ found that Sehlstrom had several severe impairments including: MS, chronic obstructive pulmonary disease, depression, a left carotid body tumor, low back pain and type II diabetes.  Tr. 16.  However, at the next step, the ALJ did not find any of these impairments met the listing of impairments criteria for being disabled.  Tr. 18.  Thus, the ALJ went on to determine her residual functional capacity.

The ALJ determined that Sehlstrom had the residual functional capacity,

> [T]o lift up to 20 pounds occasionally and 10 pounds frequently.  She can balance, stoop, crouch, kneel, crawl and climb occasionally. She cannot tolerate extremes of heat, cold, humidity, dust or fumes. She can tolerate only occasional, superficial contact with the general public and can at a regular pace but not at a fast pace.

Tr. 18.

The ALJ determined that Sehlstrom's claims "concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible".  Tr. 19.  In reaching this conclusion, the ALJ relied heavily upon residual

functional capacity assessments done by consultants with the Iowa Disability Determination Services on October 19, 2005, and December 16, 2005, respectively. Tr. 19.

The ALJ addressed nurse practitioner Mullenbach's opinion, but he found it not credible because Ms. Mullenbach did not offer a "function by function assessment" of Sehlstrom's capabilities and because Ms. Mullenbach is not an acceptable medical source. Tr. 20. The ALJ said "no weight" could be given to Mullenbach's opinion regarding Sehlstrom's ability to work full-time because this determination is reserved to the Commissioner. Tr. 20. The ALJ found that Sehlstrom could perform her past relevant work as a fast food worker and as a general cashier, and she was denied benefits. Tr. 20.

## V.    ARGUMENTS OF THE PARTIES

### A.    Plaintiff's Brief

Sehlstrom set forth three errors on the part of the ALJ. First, she argued that the ALJ did not address the mental residual functional capacity assessment performed by Herbert L. Notch, Ph. D., on December 28, 2005. Dr. Notch found that Sehlstrom is moderately limited in her "ability to complete a

normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Tr. 316. She also has a "mild" degree of limitation in maintaining social functioning. Tr. 329. Sehlstrom stated that the ALJ acknowledged these limitations, but he failed to incorporate them into his first hypothetical question to the VE. When the ALJ did incorporate them into the second hypothetical question, the VE stated that there was no work for her.

Sehlstrom next argued that the ALJ did not provide specific rational for discrediting her testimony. Sehlstrom points out that all of the medical evidence supported her subjective allegations.

The plaintiff lastly argued that the ALJ did not evaluate every medical opinion in the record. Specifically, the ALJ did not take into account Ms. Mullenbach's second opinion, which, Sehlstrom argued, corrected any errors the ALJ noted.

**B.   Defendant's Brief**

The defendant argued that the ALJ is not bound by Dr. Notch's opinions because the portion the plaintiff relied upon

is not normally relied upon by the ALJ.  The defendant argues that according to the Programs Operation Manual System ("POMS"), used by the Social Security Administration, the ALJ should rely only upon the written narrative statement in which Dr. Notch stated that Sehlstrom "showed no significant mental limitations".  Tr. 331.  This, according to the defendant, is consistent with the ALJ's decision.

The defendant argued that Mullenbach's second opinion letter should not have been considered because Sehlstrom presented it to the Appeals Council after the ALJ decision was rendered.  The Appeals Council reviewed the newly submitted evidence and, according to the defendant, the job of the Court is to then determine if considering the newly submitted evidence, the ALJ's decision is still sound.  The defendant argued that Mullenbach's opinion is not of such "magnitude" as to override the ALJ's decision based on the evidence on the record as a whole.  The defendant argued that the ALJ was not required to give more weight to Mullenbach's opinions.

The defendant also argued that the ALJ analyzed the entire record and set forth reasons as to why he did not find Sehlstrom credible.  The ALJ used the facts that Sehlstrom

worked part-time, cared for herself, her house and her children and that her symptoms could be treated with medication as support for his credibility determination. This was not error, according to the defendant. The defendant also argued that Sehlstrom's MS complaints do not comport with medical records from her neurologist that state her MS was causing no problems.

## VI. LAW AND ANALYSIS

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). See Lorenzen v. Chater, 71 F.3d 316, 318 (8th Cir. 1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. Orrick v. Sullivan, 966 F.2d 368, 371 (8th Cir. 1992)(citation omitted).

<u>Fenton v. Apfel</u>, 149 F.3d 907, 910-11 (8th Cir. 1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 136-37 (8th Cir. 1998) <u>citing</u> <u>Brinker v. Weinberger</u>, 522 F.2d 13, 16 (8th Cir. 1975). <u>See</u> <u>also</u> <u>Patrick v. Barnhart</u>, 323 F.3d 592, 595 (8th Cir. 2003).

The Court of Appeals held, as cited above, that if two inconsistent positions are possible and one represents the Secretary's findings, the Court must affirm. On the other hand, the Court is obligated to apply a balancing test to evidence which is contradictory in order to determine if the decision of the Commissioner is supported by substantial evidence on the record as a whole. In <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987), then Chief Judge Lay wrote:

> "[S]ubstantial evidence on the record as a whole," however, requires a more scrutinizing analysis. <u>Smith v. Heckler</u>, 735 F.2d 312, 315 (8th Cir. 1984). In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. National Labor Relations Bd.</u>, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L. Ed 456 (1951). Thus, the court must also take into consideration the weight of

the evidence in the record and apply a balancing test which is contradictory. <u>See Steadman v. Securities and Exchange Commission</u>, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981). It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.

The parties and the ALJ all seem to agree that MS causes fatigue as well as cognitive and other problems Sehlstrom is alleging. For this reason, the case of <u>Harris v. Barnhart</u>, 356 F.3d 926 (8th Cir. 2004), relied upon by the defendant, is not controlling. The defendant cites <u>Harris</u> for the proposition that it is not unreasonable for an ALJ to discredit a claimant's alleged disabling headaches based upon the fact that, among other things, she worked a part-time job. The <u>Harris</u> Court determined that the claimant there did not suffer from debilitating pain. In this case, however, the ALJ found that Selhstrom did suffer from the headaches she complained of. He did not, however, find the "intensity, persistence and limiting effects" of her headaches to be as Sehlstrom described them. Tr. 19. As set forth below, the record as a whole does not support this finding.

Sehlstrom testified about her fatigue and her medical records support her testimony. Additionally, two of the general managers from the Kentucky Fried Chicken restaurant at which she worked wrote letters to the Social Security Administration. The first states as follows:

> Ms. Sehlstrom has difficulty performing all of the duties of her job due to her health condition...[she] requires reminders to follow through on every day routines that she used to handle without difficulty. For example, in our restaurant, we have set times that certain foods need to be cooked and we require trays to be put into warmers. Ms. Sehlstrom formerly fulfilled these duties without difficulties but now needs reminders to take care of these routine matters.

Tr. 197.

The second letter states:

> Becky no longer can lift greater than ten pounds, is not able to stand for long periods of time, and has decreased gross motor skills. She has good cognitive ability at the start of each day but it quickly diminishes within two to three hours of work. For example, she forgets what she is doing during a specific task and or may repeat the task twice. She sometimes will present with a blank stare and will pause for five to ten seconds before we can get a response from her. I have noticed lately that she has had trouble with her gait. She isn't able to consistently maintain her balance and she

> frequently will have to grab a hold of the
> countertops to move about.  I am also aware
> of the fact that Becky has incontinence of
> bowel and bladder.
>
> We have tried to work with her for full
> time hours, but she isn't able to last that
> long.  She has enough trouble with the
> three to four hours that she tries to work
> now.  It is very difficult for her to make
> it through this short shift already.  We
> have attempted to cross train her as a cook
> for better pay but, there is too much
> lifting and the job is too dangerous for
> her diminished physical and cognitive
> abilities.

Tr. 180.

The Court is not using these employer letters to determine Sehlstrom's residual functional capacity, i.e., how much weight she can lift, how many hours she can work, etc., and recognizes that her employers are not experts on some of the opinions they give.  The Court incorporates the letters to show that they corroborate Sehlstrom's own testimony and allegations of fatigue, mental disability and the need for frequent breaks.  Her employers have no personal interest in the outcome of this case nor any reason to be dishonest.

At the hearing before the ALJ, the VE testified that Sehlstrom could not perform her past relevant work under the second hypothetical set forth above, which included the need

for breaks and a slow pace. Much of the medical evidence in the record corroborates Sehlstrom's assertion that she needs frequent breaks and has a very slow pace at work. Additionally, her employers, those who have had the opportunity to observe her over the years, have noted that, "it is very difficult for her to make it through" a three to four hour shift. Tr. 180. This Court can find no evidence refuting the need for breaks and the slow pace. Thus, the Court is persuaded that the ALJ did not take all of Sehlstrom's functional restrictions into account.

> "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hillier v. Soc. §. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)). "Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." Hillier, 486 F.3d at 365 (internal quotations omitted).

Wilson v. Astrue, 493 F.3d 965, 967 (8th Cir. 2007).

In addition to her part-time work, the ALJ emphasizes Sehlstrom's ability to care for herself, her children, who, she testified, do not require much care because of their ages,

and to take care of the home, which she testified she receives much assistance. However, the ability to do light activities around the home "provides little or no support for the finding that a claimant can perform full-time competitive work." Baker v. Barnhart, 457 F.3d 882, 897 (8th Cir. 2006) (citing Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995; Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)).

> [The] ability to engage in some life activities...does not support a finding that [a claimant] retains the ability to work...We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she[/he] has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). This test is consistent with relevant regulations on the issue, see 20 C.F.R. § 404.1545.

Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004).

Under Social Security Ruling ("SSR") 96-8p, a person's residual functional capacity must be evaluated based upon work performed on a regular an continuing basis. "A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, p. 2.

> "We have stated, however, that to qualify
> for work at any level a claimant must have
> the ability to perform the requisite
> physical tasks of employment on a daily
> basis...An ALJ should not penalize a
> claimant who, prior to an award of
> benefits, attempts to make ends meet by
> working in a modest, part-time job. The
> presumption that a claimant is not disabled
> merely because the claimant had a lenient
> employer, a high tolerance for pain, or no
> other means of support would unfairly shift
> the burden of proof back onto the claimant
> at a point in the proceedings when the
> burden rightfully belongs to the
> Secretary."

Cline v. Sullivan, 939 F.2d 560, 565-66 (8th Cir. 1991).

> In Thomas [v. Sullivan, 876 F.2d 666 (8th
> Cir. 1989)] we stated that an SSI claimant
> need not prove that she is bedridden or
> completely helpless to be found disabled
> and the fact that claimant cooks and cleans
> for herself, shops for groceries, does
> laundry, visits friends, attends church,
> and goes fishing does not in and of itself
> constitute substantial evidence that a
> claimant possesses the residual functional
> capacity to engage in substantial gainful
> activity.

Id. at 566.

Although it is true that an ALJ may consider part-time
work as a factor to demonstrate ability to perform substantial
gainful employment, the Court is persuaded that Sehlstrom's
employment in this case does not prove that she can perform

her past relevant jobs.

The Court also notes that the ALJ did not adopt the findings of state medical consultant Herbert L. Notch. The defendant argues that the checklist at Tr. 316, discussed above, should not be relied upon according to the Programs Operation Manual System ("POMS"), used by the Social Security Administration. Instead, argues the defendant, the ALJ should only rely upon the narrative section of the evaluation. However, Sehlstrom argues, and the Court is persuaded, that the checklist at issue does not contain a narrative section and, thus, POMS is not controlling in this instance. See Tr. 319-332.

Lastly, the Court has reviewed the record and is aware that other medical providers have given opinions that are less restrictive. However, these providers, who base their opinions on either one visit or on the medical records of another, do not take into account many of the issues that cause Sehlstrom to be disabled, as discussed above.

For these reasons, the Court is persuaded that substantial evidence on the record does not support the ALJ's decision that Sehlstrom is able to perform full-time

employment.  The Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence.  The record contains sufficient evidence to allow the Court to render this decision.

## VII.    CONCLUSION

**IT IS THEREBY HEREBY ORDERED,** pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Sehlstrom with an onset date of July 14, 2005.  The Court is persuaded that as of this date, the record reflects that Sehlstrom had several new lesions on her brain indicating acute disease.  Tr. 394.  The Court is persuaded that as of this date, Sehlstrom was disabled.

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action.  Thus, if this decision is not appealed, and Sehlstrom's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 26th day of September, 2008.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa